1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10

11

KEITH L. NASH,

12                    Plaintiff,

13          v.

14   DOUG WADDINGTON, *et al.*,

15                    Defendants.

Case No. C04-5161 FDB/KLS

REPORT AND
RECOMMENDATION

**NOTED FOR:**
**December 29, 2006**

16

17        This civil rights action has been referred to United States Magistrate Judge Karen L.

18   Strombom pursuant to Title 28 U.S.C. § 636(b)(1) and Local MJR 3 and 4.  Plaintiff alleges

19   violations of his right to access the courts.  Presently before the Court is the motion for summary

20   judgment of the remaining defendant, Defendant Tiapula (Dkt. # 235), and Plaintiff's cross-motion for

21   summary judgment (Dkt. # 247).   Plaintiff seeks a new appeal date for his personal restraint petition

22   attacking his judgment and sentence in his criminal case, an apology and damages in the amount of

23   $400,000.00.  Defendant Tiapula argues that Plaintiff has failed to demonstrate a violation of his access

24   to courts and that she is entitled to qualified immunity.  Having reviewed Defendant Tiapula's motion,

25   Plaintiff's cross-motion and response, the Court recommends that Plaintiff's claims be dismissed with

26   prejudice.

27

28   REPORT AND RECOMMENDATION - 1

1

## I. **FACTS**

2

Plaintiff is an inmate at the Stafford Creek Corrections Center (SCCC).  SCCC is a DOC

3

correctional facility that consists of Minimum Housing Units, Medium Housing Units and an

4

Intensive Management Unit (IMU)/Segregation Unit.   (Dkt. # 235, Exh. 1, ¶ 3).

5

One of the primary concerns in operating a correctional facility is the maintenance of order

6

and security in the institution.  (Id.).   There are a number of ways that these concerns are addressed

7

including the use of a prison disciplinary process and a classification/custody level process.  (Id. at ¶¶

8

4-5). Through the classification process, an offender is given a custody designation.  (Id. at ¶ 5). This

9

custody designation defines the required level of staff supervision, physical plant features and

10

supervision requirements. Custody designations are minimum, medium, close, and maximum. (Id.).

11

12

An inmate whose continued presence in general inmate population is determined to pose a

13

threat to life, property, himself, others, or the security or orderly operation of the institution are

14

placed in the Intensive Management Unit (IMU).  (Id., at ¶ 6).  Placement in the IMU may occur,

15

among other reasons, when an inmate commits serious infractions; has engaged in chronic

16

misbehavior, received numerous infractions, or engages in conduct that presents a risk, such as

17

rioting, fighting or affiliation with a security threat group.  (Id.).  Inmates who are in the IMU or in

18

the segregation unit may be there because they are on disciplinary segregation, administrative

19

20

segregation, and/or they have a custody level designation of maximum.  (Id.).

21

The IMU is the most secure incarceration unit within the Washington correctional system.

22

(Id. at ¶ 7). Generally speaking, only those inmates who pose a direct threat to the security of the

23

institution, its staff and other inmates, are housed in the IMU.  (Id.).  As the IMU houses the most

24

dangerous individuals within the Washington State penal system, security is of prime importance.

25

26

(Id.).  The design and operational procedures governing the IMU are aimed at restricting offender

27

28

REPORT AND RECOMMENDATION - 2

movement in order to maintain security.  (Id.).  Offenders in the IMU are under continuous

observation.  Their movement is restricted to an absolute minimum and, when they are moved, they

are escorted by two correctional officers.  (Id.).  The philosophy of an IMU is to provide a very

secure and disciplined residential center where behavior can be monitored, security can be maintained

and inmates can demonstrate appropriate behavior.  Another goal is to provide programming that

prepares offenders to eventually move to less restrictive levels of security when appropriate and safe.

(Id.).

There can be difficulties when an offender first comes to the IMU, until the offender de-

escalates and stabilizes in his new housing environment.  (Id. at ¶ 8).  The initial thirty days in the

IMU are used as an observation and assessment period to determine how the inmate is adjusting and

evaluate whether he is willing to engage in appropriate behavior.  (Id.).   If the offender behaves

appropriately during the first thirty days, an inmate can progress to Level 3.  (Id.).  After appropriate

adjustment within the IMU, internal security issues are lessened and an inmate can be allowed more

property. Id. The restrictions in IMU are always quite strict. Id. However an offender's behavior

dictates the restrictions, and how he will move through the level system.  (Id.).

Stringent security measures are in place in the IMU due to the threat that the inmates in the

IMU pose to the secure and orderly operation of the institution.  (Id. at ¶ 9).  This includes

restrictions on the items that inmates may possess in their cells due to concerns about the potential

misuse of those items.  (Id.).  When an inmate is initially placed in IMU the restrictions on the items

that an inmate is allowed to possess are quite stringent in order to allow that inmate a cooling off

period, assess how the inmate is going to behave and to ensure the security of the unit and the safety

of that inmate are not compromised.  (Id.).  Inmates who are placed in the IMU are frequently upset

about the placement.  (Id.).  In that frame of mind there is an increased concern that the inmate may

REPORT AND RECOMMENDATION - 3

act out in response to the placement, particularly if the placement itself was already the result of

misconduct by the inmate.  (Id.).  Inmates who are housed in short term segregation (thirty days or

less) may not have sufficient time to acclimate to the IMU.  (Id.).  Therefore there is concern that

items may be misused.  (Id.).  Paper can be, and has been, misused in a number of ways that could

compromise the secure and orderly operation of an IMU.  Inmates can use the paper to clog a toilet

and flood their cells.  (Id.).  Inmates can use the paper to cover their cell window, which makes it

impossible for the inmate to be monitored. When the inmate is not monitored, he could damage his

cell or harm himself.   (Id).  A covered cell window requires prison staff to conduct a cell entry

which could result in a use of force and places the inmate and staff at risk of injury.  (Id.).  Paper can

also be used to start a fire if the inmate has smuggled in a paperclip or pencil lead that would be

placed in an outlet and used to create an electric arc that is used to light the paper on fire.  (Id.).

In an effort to balance the security concerns associated with the potential misuse of paper by inmates

housed in short-term segregation against the inmate's right of access to the courts, short-term

segregation inmates who have a verifiable court imposed deadline within 45 days of their placement

in segregation are allowed to request specific personal legal documents in order to pursue the legal

matter. (Id. at ¶ 10).

Plaintiff was placed in the IMU at SCCC on May 19, 2002.  (Id. at ¶ 11).  His placement

occurred because he had received a serious disciplinary infraction for refusing a direct order by a

staff member to proceed or disperse from a particular area.  (Id.).  After a hearing, Plaintiff was

found guilty of the infraction and received disciplinary sanctions that included ten days of disciplinary

segregation.   As such, Plaintiff was a short term segregation offender; he was expected to be housed

in segregation for thirty (30) days or less.  (Id.).  Once Plaintiff completed his disciplinary

segregation he was placed on administrative segregation to determine whether his custody level

REPORT AND RECOMMENDATION - 4

should be demoted.  (Id. at ¶ 12).  During the administrative segregation review process, it was

recommended that Plaintiff be demoted and transferred to a close custody facility.  (Id.).  On June

13, 2002, Plaintiff was demoted to close custody and it was recommended that he remain in

segregation, as SCCC is not able to house close custody general population offenders, pending a

transfer to a close custody facility.  (Id.).  On July 29, 2002, Plaintiff was transferred to the

Washington State Penitentiary (WSP).  (Id).

On May 21, 2002 Plaintiff sent a kite (note) to Defendant Tiapula, asking her to send him his

legal property.   (Dkt. # 235, Exh. 2, Attach. A).  The next day, Defendant Tiapula responded that

Plaintiff needed to provide her with a verifiable court date within the next 45 days.  (Id.).  On May

27, 2002, Plaintiff asked Defendant Tiapula for law library materials.  Defendant Tiapula informed

Plaintiff to: "Please request this information from the law library. Thank You."  (Id., Exh. 2, Attach.

B).

On June 3, 2002, Plaintiff again requested his legal materials from Defendant Tiapula, but still

did not provide any information regarding the case or court dates.  (Id., Exh. 2, Attach. C).  On June

5, 2002, Defendant Tiapula again requested a verifiable court date.   On June 4, 2002, Plaintiff filed a

grievance against Defendant Tiapula, stating that he had requested his legal materials and that

Defendant Tiapula had not provided the materials.  (Id., Attach. B, Grievance 0210101). This

grievance was investigated by the law librarian, who indicated that she never received any

information about a deadline.  (Id.).  Plaintiff was instructed to send the information to the law

library.  (Id.).  Plaintiff appealed this grievance. (Id.).  The grievance was investigated and Plaintiff

failed to provide any information about his court deadline.  (Id.)  Staff, including Dan Van Ogle,

helped Mr. Nash search through his legal materials and he was still unable to demonstrate any valid

deadline.  (Id.).

REPORT AND RECOMMENDATION - 5

On July 2, 2002, Plaintiff sent a kite to the law library, asking how he could have access to the law library. (Id., Exh. 1, Attach. A). Sgt. Dahne responded on July 5, 2002, stating that Plaintiff could have access if he could demonstrate a verifiable court deadline. (Id.). This communication was not sent to Defendant Tiapula. (Id.). Plaintiff and Defendant Tiapula never spoke directly about his legal access issues. (Id., Exh. 2 at ¶7). Additionally, at no time did Plaintiff ever provide any evidence of a verifiable court deadline to Defendant Tiapula, or any other staff. (Id. at ¶8).

Plaintiff does not dispute these facts, although he claims that Defendant Tiapula violated DOC 590.500. (Dkt. # 247 at p. 12). Plaintiff states that "defendant failed to provide the proper instructions instead of making the affirmative decision to continuously deny plaintiff's requests which were through kites or verbally." Id. However, Plaintiff's evidence shows that Defendant Tiapula repeatedly requested that he indicate a court-imposed deadline within 45 days of his request, and that he never provided one. (Id., Exh. 9). Similarly, on June 3, 2002, Defendant Tiapula advised Plaintiff that "On your current status you will need to provide me with a verifiable court date in order for me to be able to comply with your request." Id.

## II. DISCUSSION

A. **Standard of Review**

Pursuant to Fed. R. Civ. P. 56 (c), the court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim on which the nonmoving party has the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1985).

REPORT AND RECOMMENDATION - 6

1    There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a

2    rational trier of fact to find for the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

3    475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not

4
5    simply "some metaphysical doubt.").  *See also* Fed. R. Civ. P. 56 (e).  Conversely, a genuine dispute

6    over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring

7    a judge or jury to resolve the differing versions of the truth.  Anderson v. Liberty Lobby, Inc., 477 U.S.

8    242, 253 (1986); T. W. Elec. Service Inc. v. Pacific Electrical Contractors Association, 809 F.2d 626,

9    630 (9th Cir. 1987).

10
     The determination of the existence of a material fact is often a close question.  The court must
11
12   consider the substantive evidentiary burden that the nonmoving party must meet at trial, e.g. the

13   preponderance of the evidence in most civil cases.  Anderson, 477 U.S. at 254; T.W. Elec. Service Inc.,

14   809 F.2d at 630.  The court must resolve any factual dispute or controversy in favor of the nonmoving

15   party only when the facts specifically attested by the party contradicts facts specifically attested by the

16   moving party. Id.

17
     The nonmoving party may not merely state that it will discredit the moving party's evidence at
18
19   trial, in hopes that evidence can be developed at trial to support the claim.  T.W. Elec. Service Inc., 809

20   F.2d at 630 (relying on Anderson, *supra*).  Conclusory, nonspecific statements in affidavits are not

21   sufficient, and "missing facts" will not be "presumed."  Lujan v. National Wildlife Federation, 497 U.S.

22   871, 888-89 (1990).

23   **B.      Plaintiff Has Failed to State a Claim Under 42 U.S.C. § 1983 For Violation of Access to
24           Courts**

25   To state a claim under 42 U.S.C. § 1983 the defendant  (1) must be a person acting

26   under color of state law; and (2) his conduct must have deprived the plaintiff of rights, privileges, or

27

28   REPORT AND RECOMMENDATION - 7

immunities secured by the Constitution or laws of the United States. Parratt v. Taylor, 451 U.S. 527, 535 (1981), *overruled in part on other grounds by* Daniels v. Williams, 474 U.S. 327 (1986). Implicit in the second element is a third element of causation. *See* Mt. Healthy City School Dist. v. Doyle, 429 U.S. 274, 286-87 (1977); Flores v. Pierce, 617 F.2d 1386, 1390-91 (9th Cir. 1980), *cert. denied*, 449 U.S. 875 (1980). When a plaintiff fails to allege or establish one of the three elements, his complaint must be dismissed.   That a plaintiff may have suffered harm, even if due to another's negligent conduct, does not in itself necessarily demonstrate an abridgment of constitutional protections. Davidson v. Cannon, 474 U.S. 344 (1986).

In order to state a civil rights claim, a plaintiff must set forth the specific factual bases upon which he claims each defendant is liable. Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980). A defendant cannot be held liable under 42 U.S.C. § 1983 solely on the basis of supervisory responsibility or position. Monell v. Dept. of Social Services of City of New York, 436 U.S. 658, 694 n.58 (1978); Padway v. Palches, 665 F.2d 965 (9th Cir. 1982).

In this case, Plaintiff claims that his right of access to courts was violated by Defendant Tiapula.  The touchstone of an access to courts claim is whether the access to courts program provides inmates with "meaningful access to the courts." Lewis v. Casey, 518 U.S. 343, 351 (1996). This is not a bright line test and an access to courts program is "evaluated as a whole to ascertain its compliance with constitutional standards." Bounds v. Smith, 430 U.S. 817, 832 (1997).   In matters such as placement of offenders and development of access to courts programs, courts are to defer to the expertise of prison officials. Lewis, 518 U.S. at 361 (prison officials are entitled deference with regard to access to courts programs).  Before an inmate can bring a lawsuit for an access to courts violation, the inmate must have standing – he must allege both that he was denied access to legal materials or advice and that this denial harmed his ability to pursue non-frivolous legal action. Id. at

REPORT AND RECOMMENDATION - 8

351.  In other words, he must show actual injury.  To show actual injury the inmate must, for

example, show that because of the inadequate library facilities or because of the prison regulations

governing access and use of the library facilities, the inmate was unable to file a complaint or that the

inmate lost a case because the inmate could not timely file critical pleadings.  Id.

In this case, Plaintiff alleges that he missed the one year deadline for filing a collateral attack

of his conviction due to the application of prison policy restricting access to legal materials during his

placement in a maximum security unit.  (Dkt. # 58).  This policy requires an inmate to show that he

has a deadline within 45 days.  (Dkt. # 235, Exh. 1).  In Lewis, the Court found that delays in

providing access to legal materials or assistance of up to 16 days did not violate the Constitution so

long as the delay was the product of prison regulations reasonably related to legitimate penological

interests even if the delay resulted in actual injury.  In this case, the delay was much longer –

approximately 60 days.  However, Plaintiff did not show proof of the deadline nor has he shown

proof that his collateral attack was not frivolous.  Lewis, 518 U.S. at 351 (no constitutional right to

file frivolous litigation).

In addition, the injury that Plaintiff points to in an effort to establish standing is the dismissal

of his collateral attack as "time barred" and a "mixed" petition.  (Dkt. # 247 at 10).  In denying

review, the Supreme Court of Washington specifically stated:

> Although some of Mr. Nash's claims might be exempt from the one-year limit on
> collateral attack, not all of them are. The petition is therefore "mixed" and may not be
> considered. . . Mr. Nash is free to file a petition in the future raising only exempt
> claims.

(Dkt. # 235, Exh. 3).

Thus, based on the Supreme Court's ruling, Plaintiff is free to file another petition and

REPORT AND RECOMMENDATION - 9

indeed, appears to have filed a personal restraint petition challenging his sentence. (Dkt. #247, Exh. 3).    Plaintiff has not advised the Court which claims he was permitted to bring in his current state court petition.

The uncontested record also reflects that there were legitimate penological interests in any delay in providing Plaintiff with access to his legal materials.  Plaintiff was placed in the IMU for misconduct. (Dkt. # 235, Exh. 1).  For example, paper can be used to cause property damage, interfere with prison monitoring, harm to inmates or guards, and cause fire hazards. (Id.).  The burden is on the inmate to show that a prison regulation is unreasonable.  Turner v. Safley, 482 U.S. 78, 84-85 (1987).  Gates v. Rowland, 39 F.3d 1439, 1447 (9th Cir. 1994).  Plaintiff has not satisfied this burden and has failed to show a violation of his constitutional rights.

Viewing all the evidence in the light most favorable to the Plaintiff, the Court concludes that Plaintiff has failed to show an actual injury and that the delay in providing Plaintiff access to his legal materials was reasonably related to legitimate penological interests.  Therefore, the Court recommends that Plaintiff's claims should be dismissed with prejudice.

## C.    Defendant Tiapula's Claim of Qualified Immunity

Defendant Tiapula urges that she is, in any event, entitled to qualified immunity.  As the Court has determined that Plaintiff has failed to allege a deprivation of an actual constitutional right, the issue of qualified immunity need not be reached. *See* Conn v. Gabbert, 526 U.S. 286, 290 (1999).[1]

---

[1]This Court has already noted as to Defendant Waddington that "defendant Waddington could reasonably have believed his denial of plaintiff's request lawful as there did not appear to be a due date." (Dkt. # 102 at 6).  The record reflects that Defendant Tiapula had even less information than Mr. Waddington and despite repeated requests for a deadline, was never provided with a

REPORT AND RECOMMENDATION - 10

III.  CONCLUSION

For the reasons stated above the court should **GRANT** Defendant Tiapula's motion for summary judgment (Dkt. # 235), **DENY** Plaintiff's cross-motion for summary judgment (Dkt. # 247), and dismiss Plaintiff's claims against her with prejudice.  A proposed order accompanies this Report and Recommendation.  Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on **December 29, 2006**, as noted in the caption.

DATED this  7th   day of December, 2006.

Karen L. Strombom
United States Magistrate Judge

verifiable court date.

REPORT AND RECOMMENDATION - 11